IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

MICHAEL L. STUART,         )     Case No. 10 C 2334
                                 )
             Plaintiff,     )
                                 )     Magistrate Judge P. Michael Mahoney
             v.           )
                                 )
MICHAEL J. ASTRUE,       )
Commissioner of Social Security,  )
                                 )
            Defendant.   )

**MEMORANDUM OPINION AND ORDER**

## I.    Introduction

Michael L. Stuart ("Claimant") seeks judicial review of the Social Security

Administration Commissioner's decision to deny his claim for Disability Insurance Benefits

("DIB"), under Title II of the Social Security Act. *See* 42 U.S.C. § 405(g). This matter is before

the Magistrate Judge pursuant to the consent of both parties. *See* 28 U.S.C. § 636(c); Fed. R. Civ.

P. 73.

## II.    Administrative Proceedings

On January 26, 2007, Claimant applied for Supplemental Security Income, alleging a

disability onset date of January 1, 1989. (Tr. 19.) Claimant's initial application was denied on

June 1, 2007. (Tr. 19.) His claim was denied a second time upon reconsideration on August 31,

2007. (Tr. 19.) Claimant then filed a timely request for a hearing before an Administrative Law

Judge ("ALJ") on September 28, 2007. (Tr. 19.) The hearing took place on December 2, 2008,

via video teleconference between Evanston, Illinois and Rockford, Illinois, before ALJ Robert T.

Karmgard. (Tr. 29.) Claimant appeared and testified in Rockford with his attorney present. (Tr. 19.) Claimant's uncle, Robert Kostenbader ("Kostenbader"), medical expert ("ME"), Ellen Rozenfeld, and vocational expert ("VE"), William Newman, also testified before the ALJ. (Tr. 19.)

On April 29, 2009, the ALJ held that Claimant was not disabled and denied his claim for DIB. (Tr. 19.) The ALJ's decision is considered the final decision of the Commissioner. *See* 20 C.F.R. §§ 404.981, 416.1455, 416.1481. Claimant now files a complaint in this Federal District Court, seeking judicial review under 42 U.S.C. § 405(g).

**III.    Background**

Claimant was born on October 20, 1963, and was forty-five years old at the time of the hearing. (Tr. 37.) Claimant stood six feet and three inches tall, and weighed approximately 180 pounds when he appeared in front of the ALJ. (Tr. 39.) At the time of the hearing, Claimant resided in Freeport, Illinois with his grandfather. (Tr. 37-38.) He completed the tenth grade, and failed to earn a G.E.D. (Tr. 39.)

Claimant was involved in a motorcycle accident on August 21, 1987, in which he was thrown from the motorcycle after it hit a parked car. (Tr. 257.) Claimant stated that he suffered a traumatic brain injury and spent approximately two to three months in a hospital and another two to three months in a rehabilitation facility. (Tr. 347.) Medical notes also state that Claimant had a right hip fracture which was subsequently pinned. (Tr. 274.) Further medical notes show that an x-ray conducted on April 9, 1992 revealed that Claimant had exostosis on the medial epicondyle of right femur which was surgically removed. (Tr. 275.)

The Claimant's main previous work was working as a janitor and working on an assembly line stacking cheese. (Tr. 91.) The VE present at the hearing reported both positions as unskilled, light professions. (Tr. 91.) Claimant worked the janitorial job five days a week,

approximately four hours a day, for a couple months but had to leave the job due to a lack of transportation. (Tr. 43.)

In the hearing which took place on December 2, 2008, Claimant testified that he spends the average day watching TV or cleaning the house, which includes sweeping, vacuuming and doing the dishes.  (Tr. 46.) Claimant further stated that he does a little bit of cooking but his uncle takes him to the store. (Tr. 44.) Claimant's uncle further stated that Claimant can go to the store on his own, as long as he makes a short list of products. (Tr. 63-65.) The Claimant testified that he frequently visits with his uncle, and maintains relationships with his brother and one other friend. (Tr. 45.)  Claimant also stated that he leaves the house once or twice a day to "walk around" and can walk about a half hour before his right knee and right hip get sore.(Tr. 46, 50.) Furthermore, he stated that he tries to help his uncle cut the grass using a push lawnmower. (Tr. 54.) Claimant reported that he hardly ever consumes alcohol and had never used cocaine or crack cocaine, but examinations conducted in May of 2007 produce conflicting results. (Tr. 51-53.)

The ME testified that the Claimant was certainly capable of understanding, remembering, and following simple, routine instructions. (Tr. 80.) He then stated that Claimant is capable of sustained attention and concentration. (Tr. 81.) The ME further testified that in a predictable environment Claimant is capable of performing tasks of a simple and routine nature on a sustained basis. (Tr. 81.) He then emphasized that given the Claimant's memory impairment and the testimony, Claimant would do best in an activity where he is responsible for his own actions rather than in conjunction with others. (Tr. 81.)

The VE in the initial hearing was given the following hypothetical:

> "…we have a hypothetical male individual who's between the ages of 40 and 45 years, has a 10th grade education with the ability to read and write [the] English language, has the ability to use basic numbers, has the same prior work history as Mr. Stuart with the capacity to perform work with the following and no other additional limitations. A lift and carry up to a maximum of 20 pounds on an occasional basis, ten pounds frequently, a sit, stand and walk respectively and with normal breaks of up to six hours each within an eight-hour day. May not climb ladders, ropes or scaffolds, but otherwise climb ramps or stairs, balance, stoop, kneel, crouch and crawl on no more than an occasional basis, does not have the ability to understand, recall, focus on, attend to or carry out complex or detailed instructions, nor does he have the ability to focus on, attend to or perform complex or detailed tasks. He would, however, retain the capacity to understand, recall, focus on attention and carry out simple, routine instructions and to focus upon, attend to and perform simple, routine tasks at a sustained like pace. The individual, however, may not perform work that requires that he work in direct or nation or concert with co-employees as to the performance of mutual projects or jointly assigned tasks. By that I mean an activity that requires two or more persons acting simultaneously to complete the task performance, but retains the capacity to perform individually assigned tasks with the limitations noted above. He retains that capacity and may do so in the presence of proximity of coworkers."

(Tr. 91-92.)

When asked what impact such limitations would have on the Claimant's prior work, the VE stated that it would have no impact. (Tr. 92.) The VE testified that other work existed that such a Claimant could perform including packager, housekeeper, and cafeteria attendant, which constitute unskilled, light professions. (Tr. 93.) The VE further stated the Claimant could perform the jobs of sorter and bench assembler, both of which constitute unskilled, sedentary professions. (Tr. 93.)

**IV.** **Medical History**

    **1.** **Right Hip and Right Knee**

On August 21, 2007, Claimant was admitted to the Freeport Memorial Hospital after being involved in a motorcycle accident. (Tr. 257.) Notes from a report stated that after the accident the Claimant had a right hip fracture which was subsequently pinned. (Tr. 274.)

A report from the Department of Radiology, produced on April 26, 1988, noted that x-rays did not show any recent bone injury or destruction in the right knee, but there was some calcification in the soft tissues adjacent to the medial condyle of the femur. (Tr. 265.) The note speculated that this was probably the result of previous trauma. (Tr. 265.) The same x-ray provided views of the Claimant's pelvis and right hip. (Tr. 265.) These views exposed some deformity of the pelvis with a bony growth along the sacroiliac area on the left side and deformity at the acetabulum and pubic area on the right side from previous trauma. (Tr. 265.) The x-ray also revealed a relative radiolucency in the cortex of the shaft of the right femur laterally opposite the lesser trochanter. (Tr. 265.) This was not present on the x-rays taken at the time of Claimant's motorcycle accident, nearly eight months earlier. (Tr. 265.)

Claimant visited Freeport Memorial Hospital on April 9, 1992 after experiencing knee pain. (Tr. 276.) J. L. Lutz, D.O., examined Claimant's knee and found that his knee only had a range of motion from 30 degrees to 140 degrees and Claimant was unable to extend it the last 30 degrees. (Tr. 276.) Claimant had a large, mildly tender bony mass over the medial aspect of the femur at the femoral epicondyle. (Tr. 276.) Claimant's gait was significantly altered by the lacking 30 degrees of extension. (Tr. 276.) An x-ray further revealed that there was a large exostosis in the medial epicondyle of the right femur. (Tr. 276.) The overall diagnosis was that

Claimant had exostosis on the medial epicondyle of right femur with loss of extension of knee. (Tr. 276.) The following day, at a preoperative medical clearance, Dr. M. J. Merry, M.D., assessed the Claimant and found that the Claimant had exostosis of the right knee, and persistent cognitive deficit. (Tr. 275.) After the operation, Claimant was instructed to use crutches. (Tr. 275.)

On February 18, 2001, Claimant admitted himself to the Freeport Health Network – Emergency Department complaining of right knee pain after tripping. (Tr. 315.) Claimant's knee was swollen and tender. (Tr. 317.) Ace wrap was applied to the Claimant's knee and he was discharged. (Tr. 315.)

Claimant was referred to Elizabeth Myers, A.P.N., F.N.P., for a consultation on October 16, 2009. (Tr. 461.) A motor examination of the Claimant revealed that he had 5/5 strength in all four extremities and muscle groups. (Tr. 462.) Claimant had a normal and tandem gait and successfully withstood postural challenges. (Tr. 462.) Myers met with the Claimant again on November 5, 2009 for a follow up. (Tr. 464.) Myers found that Claimant had normal muscle tone and strength in all four extremities. (Tr. 465.) She further found that Claimant had a normal gait but could not withstand postural challenges. (Tr. 465.)

**2.      Brain and Head Injury, Diminished Intellectual Function, and Memory Impairment**

On July 28, 2004, Terrance E. McGovern, Ph.D., conducted a neuropsychological evaluation of the Claimant. (Tr. 346.) Dr. McGovern's notes describe his behavioral observations of the Claimant. (Tr. 346.) Claimant was alert, attentive, and cooperative throughout out the assessment. (Tr. 346.) His affect and manner were normal in range and intensity of expression. (Tr. 346.) Claimant's thought processes were logical, well-ordered, and

relevant to the topic at hand. (Tr. 346.) Speech was fluent and his words were articulated without difficulty. (Tr. 346.) His motivation and task persistence were satisfactory and his error awareness was intact. (Tr. 346.) Claimant's test taking behavior was considered conducive of a typical level of functioning. (Tr. 346.)

Dr. McGovern's notes next discuss Claimant's Physical/Psychological Symptoms. (Tr. 347.) The report states that the Claimant was not taking any medication and had no history of any problems with drugs or alcohol. (Tr. 347.) Claimant denied any weakness or numbness in parts of his body and he has no problems with balance. (Tr. 347.) He stated that he had no problems with understanding what people said to him or what he reads. (Tr. 347.) Claimant admitted to some problems with memory but explained that these problems only occurred on an "off and on" basis. (Tr. 347.)

Aptitude testing was conducted during the evaluation. (Tr. 347.) Current overall functioning, as measured by the Wechsler Abbreviated Scale of Intelligence, places the Claimant in the Average range. (Tr. 347.) Claimant's Full Scale Intelligence Quotient was measured at 93 placing him at the 32nd percentile as compared to adults his own age. (Tr. 347.) Claimant obtained a Verbal Score Quotient of 86 (Low average rank), which placed him at the 18th percentile. (Tr. 348.) His Performance Scale Quotient of 103 places him at the 58th percentile. (Tr. 348.)

The Wechsler Memory Scale assesses three major categories of memory functioning: Immediate Memory, General Memory, and Working Memory. (Tr. 349.) A measure of Claimant's Immediate Memory revealed an index of 61, which is classified as extremely low. (Tr. 349.) A measure of Claimant's General Memory revealed an index of 57, which is also classified as extremely low. (Tr. 349.) Claimant's Working Memory index was 81, which is

classified as low average. (Tr. 349.) Dr. McGovern's notes indicate that the Claimant's memory functioning falls within impaired range. (Tr. 349.) Dr. McGovern further notes that Claimant will have great difficulty learning new materials. (Tr. 349.)

Dr. McGovern's summary and conclusions state that Claimant's intellectual skills fall within the average range. (Tr. 351.) However, there was a significant difference between Verbal and Performance skills that is consistent with a learning disorder. (Tr. 351.) Dr. McGovern further stated that he believed that the Claimant's most critical loss falls in the area of memory impairment but his other cognitive functions were intact. (Tr. 352.) Claimant appeared otherwise well-adjusted in spite of his memory limitations. (Tr. 352.)

On May 22, 2007, Claimant underwent another psychological evaluation by Dr. John L. Peggau, Psy.D.. (Tr. 364.) Dr. Peggau's notes state that the Claimant was not currently receiving any outpatient mental health treatment and has never required inpatient psychiatric services. (Tr. 364.) The Claimant was also not prescribed any medications at the time of the evaluation. (Tr. 364.) Claimant reported a history of using crack and marijuana. (Tr. 364.) He said he last used crack three years prior to the evaluation but he had been using it every other day for a couple of years. (Tr. 364.) Claimant further stated that it had been years since he had smoked marijuana. (Tr. 364.) Claimant also stated that he typically drinks a six-pack of beer every weekend. (Tr. 364.)

Dr. Peggau's notes indicate that Claimant's speech was logical and sequential with no indications of a thought disorder. (Tr. 364.) Claimant denied any hallucinations or delusions and his behavior was appropriate. (Tr. 364.) His gait and motor activity were within the normal range, but Claimant stated he "wobble walks," because of his knee and hip problems. (Tr. 364.) Claimant reported that he is able to complete daily household tasks as well as doing his own

grocery shopping as long as he brings a list of what to buy. (Tr. 365.) When asked about his typical day, Claimant said, "I get up, go across the hall to wake my friend for work. Then I watch TV until it's time to wake up my grandfather and I make sure he takes his medications…" (Tr. 365.)

Dr. Peggau reported that Claimant's sensorium and mental capacity were within normal limits and he was appropriately oriented. (Tr. 365.) Claimant was able to recall seven digits forward and four digits backward. (Tr. 365.) Following a 40 minute delay, the Claimant was asked to recall four words read to him earlier. (Tr. 365.) Claimant was below average as he was only able to recall one of the four words. (Tr. 365.) Dr. Peggau further noted that Claimant was able to quickly complete Serial 7 Subtraction Task from 100. (Tr. 365.)

In his summary and conclusion, Dr. Peggau stated that although the Claimant has never worked very long at one place of employment, he was able to work. (Tr. 366.) He was able to appropriately respond to judgment questions and did not appear to be antisocial. (Tr. 366.) Dr. Peggau further stated the Claimant did not appear to have any type of significant memory problems, and "[he] certainly did not have a mental illness that would impair his ability to work." (Tr. 366.) Claimant has no difficulty understanding, remembering, sustaining concentration or persisting in tasks when asked to do so. (Tr. 366.) Claimant presented no symptoms of a major mental illness other than a personality disorder. (Tr. 366.) Dr. Peggau diagnosed the Claimant with Polysubstance Dependence. (Tr. 366.)

On June 5, 2007, Jerrold Heinrich, PHD, completed a Psychiatric Review Technique. (Tr. 368.) In Section G, Personality Disorders, Heinrich noted intense and unstable interpersonal relationships and impulsive and damaging behavior. (Tr. 375.) He also reported the following: In regard to Claimant's restriction of activities of daily living and episodes of decompensation,

each of extended duration, there were no limitations; in terms of the Claimant's difficulties in maintaining social functioning and difficulties in maintaining concentration, persistence, or pace, there were only a mild limitations. (Tr. 378.)

Claimant was referred to Elizabeth Myers, A.P.N., F.N.P., for a consultation on October 16, 2009. (Tr. 461.) Myers performed a neurological examination of Claimant and noted the patient scored a 25 out of a possible 30 on the MMSE. (Tr. 462.) Claimant's responses regarding interrogatives for fund of knowledge were also met by a lot of hesitation. (Tr. 462.) Myers further noted that Claimant's thought content was ambivalent. (Tr. 462.) After further examination, Myers concluded that the Claimant had presenile dementia. (Tr. 462.)

Myers met with the Claimant again on November 5, 2009 for a follow up. (Tr. 464.) She noted that the Claimant had memory and balance problems. (Tr. 465.) A mental examination of the Claimant again resulted in a score between 24 and 25 out of 30 on the MMSE. (Tr. 465.) Claimant's thought content was ambivalent and his fund of knowledge seemed to be lacking when considered with regards to his age and education. (Tr. 465.) An MRI of the Claimant's brain exposed mild atrophy and a fairly large area of encephalomalacia involving the left frontal lobe of the brain (Tr. 465-66). Myers again assessed the Claimant as having presenile dementia. (Tr. 465.)

## V.    <u>Standard of Review</u>

The court may affirm, modify or reverse the ALJ's decision outright, or remand the proceeding for rehearing or hearing of additional evidence. 42 U.S.C. § 405(g). The ALJ's legal conclusions are reviewed *de novo*. *Binion v. Charter*, 108 F.3d 780, 782 (7th Cir. 1997). However, the court "may not decide the facts anew, reweigh the evidence or substitute its own judgment for that of the [ALJ]." *Id.* The duties to weigh the evidence, resolve material conflicts,

make independent findings of fact, and decide the case are entrusted to the Commissioner. *Schoenfeld v. Apfel,* 237 F.3d 788, 793 (7th Cir. 2001) ("Where conflicting evidence allows reasonable minds to differ as to whether a Claimant is entitled to benefits, the responsibility for that decision falls on the Commissioner.")

If the Commissioner's decision is supported by substantial evidence, it is conclusive and this court must affirm. 42 U.S.C § 405(g); *see also Scott v. Barnhart,* 297 F.3d 589, 593 (7th Cir. 2002). "Substantial evidence" is "evidence which a reasonable mind would accept as adequate to support a conclusion." *Binion,* 108 F.3d at 782. If the ALJ identifies supporting evidence in the record and builds a "logical bridge" from that evidence to the conclusion, the ALJ's findings are supported by substantial evidence. *Haynes v. Barnhart,* 416 F.3d 621, 626 (7th Cir. 2005). However, if the ALJ's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

## VI.    <u>Framework of Decision</u>

The ALJ concluded that Claimant did not meet the Act's definition "disabled," and accordingly denied his application for benefits. "Disabled" is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). A physical or mental impairment is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C § 423(d)(3).

The Commissioner proceeds through as many as five steps in determining whether a Claimant is disabled. *See* 20 C.F.R. § 404.1520. The Commissioner sequentially determines the following: (1) whether the Claimant is currently engaged in substantial gainful activity, (2) whether the Claimant suffers from a severe impairment, (3) whether the impairment meets or is medically equivalent to an impairment in the Commissioner's Listing of Impairments, (4) whether the Claimant is capable of performing work which the Claimant performed in the past, and (5) whether any other work exists in significant numbers in the national economy which accommodates the Claimant's residual functional capacity ("RFC") and vocational factors. *See* 20 C.F.R. § 404.1520.

VII.    **Analysis**

A.      **Step One: Is the Claimant Currently Engaged in Substantive Gainful Activity?**

At Step One, the Commissioner determines whether the claimant is currently engaged in substantial gainful activity. *See* 20 C.F.R. § 404.1520(b). Substantial gainful activity is work that involves doing significant and productive physical or mental duties and is done, or intended to be done, for pay or profit. *See* 20 C.F.R. § 404.1510. If the claimant is engaged in substantial gainful activity, he or she is found "not disabled" regardless of medical condition, age, education, or work experience, and the inquiry ends. If the claimant is not engaged in substantial gainful activity, the inquiry proceeds to Step Two.

Here, the ALJ determined that Claimant had not engaged in substantial gainful activity since January 26, 2007, the application date. (Tr. 21.) Neither party disputes this finding. As such, this Court affirms the ALJ's Step One determination.

**B.      Step Two: Does the Claimant Suffer From a Severe Impairment?**

Step Two requires a determination whether the claimant is suffering from a severe impairment. A severe impairment is one which significantly limits the claimant's physical or mental ability to do basic work activities. *See* 20 C.F.R. § 404.1520(c). The claimant's age, education, and work experience are not considered in making a Step Two severity determination. *See* 20 C.F.R. § 404.1520(c). If the claimant suffers a severe impairment, then the inquiry moves on to Step Three. If the Claimant does not suffer a severe impairment, then the claimant is found "not disabled," and the inquiry ends.

In the present case, the ALJ found that Claimant had the following severe impairments: organic brain disorder, status post traumatic head injury, diminished intellectual function, memory impairment, polysubstance dependence, and a history of arthralgias of the knees. (Tr. 22.) Neither party disputes this finding. As such, this Court affirms the ALJ's Step Two determination.

**C.      Step Three: Does Claimant's Impairment Meet or Medically Equal an Impairment in the Commissioner's Listing of Impairments?**

At Step Three, the claimant's impairment is compared to those listed in 20 C.F.R. pt. 404, subpt. P, app. 1 (the "Listings"). The Listings describe, for each of the body's major systems, impairments which are considered severe enough *per se* to prevent a person from adequately performing any significant gainful activity. *See* 20 C.F.R. §§ 404.1525(a); 416.925(a). The Listings streamline the decision process by identifying certain disabled claimants without need to continue the inquiry. *See Bowen v. New York*, 476 U.S. 467 (1986). Accordingly, if the claimant's impairment meets or is medically equivalent to a listed

impairment, then the claimant is found to be disabled, and the inquiry ends. If not, the inquiry moves on to Step Four.

In performing the Step Three analysis in this case, the ALJ determined that Claimant did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. pt. 404, subpt. P, app. 1. (Tr. 20-21.)  The ALJ found that Claimant's impairments, considered singly and in combination, do not meet or medically equal the criteria of listings 12.02, 12.05, and 12.09.  (Tr. 22.)  The ALJ considered whether the "paragraph B" criteria of the listings were met with regard to mental impairments, and specifically found that the Claimant had moderate restrictions in activities of daily living, social functioning, and concentration, persistence, or pace; and that the Claimant had no episodes of decompensation.  (Tr. 22.)  The ALJ also found that Claimant did not meet the "paragraph C" criteria of listings 12.05 and 12.09.  (Tr. 22.)  As to listing 12.05, the ALJ made the following specific findings: as to paragraph A, Claimant did not meet the requirements that his mental impairment caused him to be dependent on others for personal needs; as to paragraph B, Claimant did not meet the requirement of having valid verbal, performance, or full scale IQ of 59 or less; and as to paragraph C, Claimant did not meet the requirement of having a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.  (Tr. 22-23.)

Claimant argues that the ALJ erred at Step Three by failing to find that Claimant met the requirements of Listing 12.02 for Organic Brain Disorders.  Listing 12.02 requires a finding of marked limitations in three functional areas: activities of daily living, social functioning, and concentration, persistence, or pace.  Specifically, Claimant believes the ALJ failed to consider the actual guidelines for the three relevant functional.  As to activities of daily living, Claimant

argues that the testimony at his hearing established that he was incapable of cleaning, shopping, and maintaining a residence independently or in a sustainable and useful manner over time. Claimant further argues that his psychological and memory testing placed him below the first percentile, and that the ALJ failed to explain the testing results in relation to his finding that Claimant was only moderately restricted in concentration, persistence, or pace.

The court finds that the ALJ's findings at Step Three are supported by substantial evidence in the record. Most importantly, the ALJ questioned the ME at length as to Listing 12.02. The ME gave specific explanations as to each functional area, and evidenced an accurate understanding of Claimant's record and testimony. As an example, the ME testified that Claimant is moderately limited in his activities of daily living because on one hand he is independent in his self-care, able to leave the home unaccompanied, can perform a range of household chores, does the cooking, does some limited shopping, and helps care for his grandfather; while on the other hand, Claimant does received some degree of supervision in terms of people checking in on him. (Tr. 78.) The ME found that all of the above indicated a degree of limitation that was "more than just mildly impaired" but "certainly no more than moderate." (Tr. 79.) The ME considered Claimant's memory deficits in relation to concentration, persistence, or pace, and noted evidence from the medical record showing Claimant had adequate task persistence, good motivation, and an ability to engage in mental status questions. (Tr. 79.) A review of the hearing testimony shows equally thoughtful discussions by the ME in arriving at the opinion that Claimant had moderate limitations in social functioning. (Tr. 79-80.)

The ME's opinions were supported by the hearing testimony and information in Claimant's medical record,. The ALJ reasonably relied on the ME's testimony in reaching his conclusion at Step Three. Therefore, the ALJ's Step Three determination is affirmed.

**D.      Step Four: Is the Claimant Capable of Performing Work Which the Claimant Performed in the Past?**

At Step Four, the Commissioner determines whether the claimant's residual functional capacity ("RFC") allows the claimant to return to past relevant work. Residual functional capacity is a measure of the abilities which the claimant retains despite his or her impairment. 20 C.F.R. § 404.1545(a). The RFC assessment is based upon all of the relevant evidence, including objective medical evidence, treatment, physicians' opinions and observations, and the claimant's own statements about his limitations. *Id.* Although medical opinions bear strongly upon the determination of RFC, they are not conclusive; the determination is left to the Commissioner who must resolve any discrepancies in the evidence and base a decision upon the record as a whole. 20 C.F.R. § 404.1527(e)(2); *see Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995).

When assessing the credibility of a claimant's statements about his or her symptoms, including pain, the ALJ should consider the following in addition to the objective medical evidence: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the claimant's pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication that the claimant takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms; (6) any measures other than

16

treatment the claimant uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms. Social Security Ruling 96-7p; *see* 20 C.F.R. § 404.1529(c).

Past relevant work is work previously performed by the claimant that constituted substantial gainful activity and satisfied certain durational and recency requirements. 20 C.F.R. § 404.1565(a); Soc. Sec. Rul. 82-62. If the claimant's RFC allows him to return to past relevant work, the claimant will not be found disabled; if the claimant is not able to return to past relevant work, the inquiry proceeds to Step Five.

In performing the Step Four analysis, the ALJ found that the Claimant had the residual functional capacity to perform light work as defined in 20 CFR 416.967(b), with the following restrictions:

> he can lift/carry 20 pounds occasionally; 10 pounds frequently; sit, stand, and walk respectively and with normal breaks for up to 6 hours each in an 8 hour day; may not climb ladders, ropes or scaffolds; but may otherwise climb ramps/stairs, balance, stoop, kneel, crouch and crawl no more than occasionally; does not possess the capacity to understand, recall, focus upon, attend to or carry out complex or detailed instructions or to focus upon, attend to, or perform complex or detailed tasks; but, retains the capacity to understand, recall, focus upon, attend to, and carry out simple routine instructions and to focus upon, attend to and perform simple routine tasks at a sustained workman like pace; and may not perform work which requires that he work in direct coordination or concert with co-employees as to the performance of mutual projects or jointly assigned tasks (i.e., those which require two or more persons acting simultaneously to complete a task); but, retains the capacity to perform individually assigned tasks, as limited above and may so perform such tasks in the presence or proximity of co-workers.

> (Tr. 23.)

In making his RFC determination, the ALJ indicated that he considered all of Claimant's symptoms and the extent to which the symptoms could reasonably be accepted as consistent with the objective medical evidence and other evidence. (Tr. 23.) The ALJ also considered opinion evidence in accordance with the requirements of 20 CFR 404.1529 and 20 CFR 416.927 and SSRs 96-2p, 96-5p, 96-6p, and 06-3p. (Tr. 23.) The ALJ found that Claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms. (Tr. 28.) The ALJ then had to consider the intensity, persistence, and limiting effects of Claimant's symptoms to determine the extent to which they limit Claimant's ability to do basic work activities. Where statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by medical evidence, a finding is made on the credibility of the statements based on a consideration of the entire record. The ALJ found Claimant's statements concerning intensity, persistence, and limiting effects of his symptoms were not credible to the extent they were inconsistent with the assessed RFC. (Tr. 28.)

Based on his RFC finding, the ALJ found that Claimant was capable of performing his past relevant work as an assembler and laborer/janitorial. (Tr. 28.) Both jobs were classified as unskilled and/or light work. (Tr. 28.) The ALJ also acknowledged that Claimant's past work may not have been at substantial gainful activity levels, and found in the alternative that Claimant could perform a significant number of jobs in the national economy. (Tr. 29.) In reaching his conclusion, the ALJ relied on the VE's testimony that the following sedentary jobs would be classified as light work that would not entail dealing with significant changes in work procedures and would not prohibit an employee from making or using a list of work instructions: light-packer (25,480 in Illinois); housekeeper (30,500); cafeteria attendant (30,845); sedentary sorter (22,920); and assembler (65,494). (Tr. 29.)

Claimant argues that the ALJ failed to make a finding as to the credibility of Mr. Kostenbader, and did not properly evaluate Claimant's credibility pursuant to SSR 96-7p. Claimant urges the court to find that the ALJ's failure to appropriately discuss the weight given to the testimony of Claimant and his uncle led to a flawed RFC, which undermines the opinion of the VE and the ALJ's ultimate conclusion.

As to the testimony of Mr. Kostenbader, Claimant believes it showed certain limitations that, if credible, would support a finding that Claimant was disabled. In particular, Claimant points to Mr. Kostenbader's testimony that he checked in on Claimant daily; that Claimant forgot to go to work at a job with a relative; that Claimant could not remember how to do a task such as working a riding lawnmower; and that Claimant would become frustrated by simple tasks such as raking leaves. (Claimant's Mem. in Support, Dkt. No. 27, pp. 8-9.) Because the VE testified that a person could not perform competitive employment if he needed to be shown how to do required tasks more than two or three times, or if he was late or missed work more than three times, Claimant argues that the ALJ must have disregarded Mr. Kostenbader's testimony in coming to the conclusion that Claimant could perform competitive employment. (Claimant's Mem. in Support, Dkt. No. 27, pp. 9.) Claimant believes the ALJ was under an obligation to explain the weight given to Mr. Kostenbader's testimony.

The ALJ does not have an obligation to discuss every piece of evidence. *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010). The ALJ is required by SSR 06-03 to consider opinions from "non-medical sources" as reflected in the case record, though SSR 06-03 also makes clear the distinction between what the ALJ must explain in the disability determination and what the ALJ must consider. SSR 06-03. It is clear from the record that the ALJ carefully considered Mr. Kostenbader's testimony, along with the ME's opinions on said testimony. The

ME stated that Claimant was not living in a highly supportive environment, and that he was capable of carrying out simple and routine instructions with sustained attention and concentration. (Tr. 81, 86.) The ME noted the testimony from Mr. Kostenbader that Claimant could become frustrated when given multiple tasks in opining that Claimant would do best in an activity where he is responsible for his own actions. (Tr. 81.) In light of the ME's testimony, the ALJ incorporated certain limitations into his hypothetical that appear to have only been supported by the testimony of Mr. Kostenbader. Namely, the ALJ's hypothetical–and ultimately the RFC–included limitations that the Claimant could not "understand, recall, focus upon, attend to or carry out complex or detailed instructions or to focus upon, attend to, or perform complex or detailed tasks" and was unable to "work in direct coordination or concert with co-employees as to the performance of mutual projects or jointly assigned tasks." The court finds that the ALJ considered, and in some instances, incorporated the testimony of Mr. Kostenbader.

Claimant also argues that the ALJ failed to perform a proper credibility assessment pursuant to SSR 96-7p. The court finds that the ALJ appears to have evaluated and articulated many of the factors required by SSR 96-7. The ALJ questioned Claimant at length about his daily activities, and correctly noted in his decision that the Claimant testified to cleaning the house, vacuuming, shopping and visiting with his uncle, cooking, and watching television with his friend. Moreover, the transcript of the administrative hearing reveals that the ALJ examined Claimant's credibility in relation to his answers about past drug and alcohol use. When the Claimant testified that he had "hardly ever" used alcohol since his 1987 motorcycle accident, the ALJ brought up a discrepancy based on a 2007 psychological evaluation where Claimant reported drinking a six pack of beer on weekends. (Tr. 51, 364.) When Claimant denied any prior use of crack or cocaine, the ALJ raised Claimant's reports on the same 2007 psychological

evaluation that he had used crack every other day for a couple of years, and had last used it "one, no, three years ago." (Tr. 52-53, 364.) The ALJ's finding that Claimant's statements about the intensity, persistence, and limiting effects of his symptoms were not supported by the medical record, when combined with Claimant's contradictory testimony at his hearing, is sufficient to support the ALJ's credibility finding.

The ALJ's findings that the Claimant was not disabled are supported by substantial evidence in the medical record:

- When Claimant was incarcerated in 2004, his neuropsychological evaluation showed average intellectual skills, a learning disorder, impaired memory function, but he was otherwise well adjusted in spite of memory limitations.

- Claimant's prison records reveal normal mental status and no mobility deficits.

- On May 27, 2007, an examining psychologist found that Claimant did not appear to have any type of significant memory problem and he did not have an illness that would impair his ability to work.

- In a June 5, 2007 assessment, the state agency reviewing physician opined that Claimant's existing mental impairments were non-severe and that Claimant had mild limitation in social functioning and maintaining concentration, persistence, or pace.

- There is no record of the Claimant taking any medication for his alleged symptoms.

- There is also no indication in treatment records of restrictions placed on the Claimant by treating or examining physicians.

Overall, the court finds the ALJ's RFC to be substantially supported by the evidence in Claimant's record. In fact, despite a significant medical record the ALJ correctly notes that there is no indication of treatment for Claimant, nor is there any indication from a treating or examining physician that Claimant would be unable to work. On the contrary, the ALJ assigned some weight to the state agency reviewing physicians, whose RFC forms supported a finding of not disabled. The ALJ questioned the ME at length during the hearing, as did Claimant's counsel, and the ALJ reasonably found the ME's opinions compelling. The court notes there is no indication that the ME's testimony is contradicted by the opinion of any treating or other physician found in the medical record. The ALJ did, however, acknowledge the testimony of Claimant and Mr. Kostenbader when he limited Claimant to simple and routine tasks and instructions that did not require work in concert with others. The ALJ's discussion of Claimant's medical history combined with the detailed questioning and testimony elicited at Claimant's hearing drew a logical bridge between the substantial evidence in the medical record and his RFC finding.

The ALJ reasonably relied on the VE's testimony that a person with Claimant's RFC would be capable of performing his past relevant work as an assembler and laborer/janitorial worker. Based on the foregoing, the court affirms the ALJ's finding at Step Four.

The court notes that due to a lack of evidence in the record regarding whether Claimant's past relevant work constituted substantial gainful activity, the ALJ requested that the VE list other jobs Claimant could perform based on the hypothetical RFC. The VE testified that there

were over 170,000 light and sedentary jobs that Claimant could perform in the State of Illinois. Neither party appears to allege that Claimant's past relevant work was not substantial gainful activity, so the court rests on its affirmation at Step Four. Notwithstanding, because the court finds the ALJ's RFC to be supported by substantial evidence, an affirmation at Step Five would also be appropriate.

## VIII.   Conclusion

Based the foregoing reasons, the Commissioner's motion for summary judgment is affirmed and Claimant's motion for summary judgment is denied.

ENTER: _____

**P. Michael Mahoney, Magistrate Judge**
**United States District Court**

**DATE: December 4, 2012**